**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **V.T.**, *a minor by and through her parents,* **M.E.T. and M.J.T.** <br>          **Plaintiff,** <br><br>     **v.** <br><br> **NORTH PENN SCHOOL DISTRICT, AND** <br> **MEGAN MCGEE-HEIM,** <br>          **Defendants.** | **CIVIL ACTION** <br><br><br><br> **NO.  25-CV-6189** |

**MEMORANDUM OPINION**

Plaintiff V.T., a minor, through her parents, has sued, pursuant to 42 U.S.C. § 1983, the

North Penn School District ("the District"), and Megan McGee-Heim ("McGee-Heim"), its

Director of Special Education,[1] for violations of her Fourteenth Amendment rights premised on

injuries she suffered as a result of a state-created danger.  She also brings a Section 1983 *Monell*

claim against the District.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658

(1978).  The Defendants move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss

all of V.T.'s claims.  Fed. R. Civ. P. 12(b)(6).  For the reasons that follow, the Motion shall be

denied.

### I.    FACTS ALLEGED

The following allegations, found in the Amended Complaint, are taken as true.  *Fowler v.*

*UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  Plaintiff describes how an attack on her by

another student on school grounds left her with serious injuries.  The attacker ("Student 1"), who,

like V.T. was in the seventh grade, had been expelled from a private school for students with

behavioral and/or special education needs where she had been placed after having spent some

time in District schools because of her "significant social, emotional and behavioral health

---

[1] The Amended Complaint notes that McGee-Heim is sued only in her individual capacity, not her official capacity.

1

challenges at school" and documented history of violent outbursts.

Despite her severe emotional and behavioral needs, Student 1 was placed in the District's Pennbrook Middle School ("Pennbrook") on the orders and approval of Defendant McGee-Heim without the development of, or revision to, her individualized education plan ("IEP"); an IEP meeting being convened; a psycho-educational reevaluation or a functional behavior assessment; or, "appropriate safeguards or protections" to address those needs.

Shortly after arriving at Pennbrook, and after threatening behavior toward some students, including Plaintiff (who shared some of her classes), Student 1 developed a "hit list" on her phone of students whom she believed had wronged her. She told others of her plan to attack one or more of her targets and that she would take action during lunch on a specific date—April 17, 2024. Alarmed, Plaintiff, as well as other students and parents who had heard of the threat, brought the situation to the attention of Pennbrook officials. A Pennbrook administrator told V.T. that the threats would be investigated and that she would be kept safe. But that is not what happened.

On the day of the threatened attack, Plaintiff did not see Student 1 in any of her classes and was told by other students that Student 1 was missing from their classes as well. However, during seventh grade lunch, a staff member brought Student 1 into the cafeteria. Student 1 spoke briefly with some other students, then left the cafeteria, still escorted by the Pennbrook staff member. When V.T. finished her lunch and was walking toward the door to leave the cafeteria, Student 1 came back in. She dashed away from her staff escort toward V.T. then hit her on the back of the head with a metal tumbler she had been carrying with her all the while. As Plaintiff attempted to turn and face her attacker, Student 1 grabbed her hair and used it to slam V.T.'s head into a nearby lunch table, all while repeatedly screaming "I want to fucking murder you."

2

Pennbrook staff intervened, trying to pull V.T. away from Student 1, while Student 1 continued to hold onto V.T.'s hair and hit her.  Plaintiff avers that she is physically and emotionally scarred by the attack.

## II.   STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  When analyzing a motion to dismiss, the complaint must be construed "in the light most favorable to the plaintiff," with the question being "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Fowler*, 578 F.3d at 210 (citation omitted).  Legal conclusions are disregarded, well-pleaded facts are taken as true, and a determination is made as to whether those facts state a "plausible claim for relief."  *Id.* at 210-11.

## III.   ANALYSIS

V.T.'s claims are predicated on alleged violations of her Fourteenth Amendment right to substantive due process.  The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  As a "limitation on the State's power to act," substantive due process "confers no affirmative right to government aid, even where such aid may be necessary to secure life, liberty or property[.]"  *DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189, 195-96 (1989).  The corollary of this principle is that "[i]f the Due Process Clause does not require the State to

3

provide its citizens with particular protective services, it follows that the State cannot be held liable . . . for injuries that could have been averted if it provided them." *Id.* at 196-97. Thus, "as a general matter, . . . a State's failure to protect an individual from private violence [such as bullying] simply does not constitute a violation of the Due Process Clause." *Morrow v. Balaski*, 719 F.3d 160, 166 (3d Cir. 2013) (quoting *DeShaney*, 489 U.S. at 197).

There are, however, two exceptions to this broad proposition. First, a duty to protect may "arise out of certain 'special relationships' created or assumed by the State with respect to particular individuals." *DeShaney*, 489 U.S. at 197. It does not, however, emerge from the State's knowledge of an individual's "predicament or from its expressions of intent to help [them]." *Morrow*, 719 F.3d at 168. Rather, the duty to protect attaches where "it is the State's affirmative act of restraining the individual's freedom to act on [their] own behalf—through incarceration, institutionalization, or *other similar restraint of personal liberty*—[which triggers] the protections of the Due Process Clause." *Id.* Essentially, where the State's control is so complete that an individual cannot resolve the issue or seek help on their own, a duty to protect inheres. *See id.*; *see also Horton v. Flenory*, 889 F.2d 454 (3d Cir. 1989). Required attendance at a middle school does not create such a special relationship. *See Morrow*, 719 F.3d at 202-03 (Nygaard, J. dissenting) ("Despite compulsory education laws, we held that schools do not have an affirmative constitutional duty to protect students from the actions of third parties while they attend school." (citing *D.R. v. Middle Bucks Area Vocational Tech. Sch.*, 92 F.3d 1364, 1371-72 (3d Cir. 1992))).

The Parties agree that the "special relationship" exception does not apply here. They do, however, argue over whether her claims plausibly fall within the second exception—that her injuries arose from a state-created danger. *See Kneipp v. Tedder*, 95 F.3d 1199, 1201 (3d Cir.

4

1996); *Morrow*, 719 F.3d at 167.  To survive Defendants' Motion to Dismiss on this claim, V.T. must have plausibly alleged that: (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts;[2] and (4) the state actor affirmatively used its authority in such a way that created a danger to the citizen, or rendered that citizen more vulnerable to danger than had it not acted at all.  *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006).

### A.  State-Created Danger Claim

#### i.    *Foreseeable and Fairly Direct Harm*

Turning now to the first requirement of a state-created danger claim: was the harm caused foreseeable and fairly direct?  "To adequately plead foreseeability, a plaintiff must allege an awareness on the part of the state actors that rises to [the] level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm."  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 238 (3d Cir. 2008).  "Fairly direct" resounds in causation, as the defendants' actions cannot be "separated from the ultimate harm by a lengthy period of time and intervening forces and actions."  *Henry v. City of Erie*, 728 F.3d 275, 282 (3d Cir. 2013).

McGee-Heim contends that V.T. cannot meet her burden, as "no facts [have been pleaded] demonstrating any actual knowledge or an awareness of risk by [McGee-Heim]."[3]  Such is belied by V.T.'s allegations that McGee-Heim was aware of Student 1's propensity for violence before placing her at Pennbrook; was in possession of Student 1's full disciplinary

---

[2] Neither Defendant makes an argument with regard to whether this element has been met.

[3] McGee-Heim makes no argument that V.T. has failed to show a causal link between her alleged decisions and Plaintiff's injuries.

history (which detailed Student 1's many prior infractions and assaults); and that she had been told of Student 1's threat to attack someone on her hit list during lunch on April 17, 2024. Accordingly, V.T. has plausibly alleged that McGee-Heim had actual knowledge of the risks posed by Student 1. Because McGee-Heim offers no argument as to why such information did not provide adequate notice or was otherwise deficient, her position is forfeited. *See United States v. Heatherly*, 985 F.3d 254, 270 (3d Cir. 2021) (treating failure to "develop[ ] . . . arguments properly" as forfeiture); E.D. Pa. R. Civ. P. 7.1(c) ("Every motion not certified as uncontested, or not governed by Local Civil Rule 26.1(g), shall be accompanied by a brief containing a concise statement of the legal contentions and authorities relied upon in support of the motion."); *see also Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997) ("[A]n argument consisting of no more than a conclusory assertion such as the one made here . . . will be deemed waived.").

**_The District_**: On this question, the District mirrors McGee-Heim, to wit that V.T. has not offered any facts to show that the District had actual knowledge or an awareness of risk, or that Student 1's attack on V.T. was otherwise foreseeable.[4] Once again, this argument is directly contradicted by allegations found in the Amended Complaint. Numerous students and parents, including V.T., reported Student 1's specific threats to Pennbrook administration. First, V.T. and another student, C.C., met with two Pennbrook administrators on April 16 to report Student 1's threats against V.T. They submitted a written report regarding the threats and V.T.'s fears. On the morning of April 17, V.T.'s parents raised their own concerns regarding Student 1's threats during an unrelated meeting with Pennbrook administrators. Furthermore, the District's Board of Directors held a meeting on April 18, 2024, the day after the attack at which members of the

---

[4] The District offers no argument regarding the "fairly direct" facet of this element.

6

public described how other students and their parents had specifically warned Pennbrook that Student 1 intended to attack someone during lunch on April 17.

### ii.    Shocks the Conscience

The next question is whether V.T. has plausibly alleged that the Defendants' actions shock the conscience. *Bright*, 443 F.3d at 281. "[T]he exact level of culpability required to shock the conscience . . . depends on the circumstances, and . . . varies with the state actor's opportunity to deliberate before taking action." *Kedra v. Schroeter*, 876 F.3d 424, 437 (3d Cir. 2017); *Walter v. Pike Cnty.*, 544 F.3d 182, 192-93 (3d Cir. 2008). In situations where a state actor has time to make "unhurried judgments," a plaintiff must show that officials acted with "deliberate indifference." *Id*. Deliberate indifference "requires significantly more than negligence." *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 329-30 (3d Cir. 2020) (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849-50 (1998)). Rather, it requires a plaintiff to show the defendant acted with "conscious disregard of a substantial risk of serious harm" or "willful disregard, demonstrated by actions that evince a willingness to ignore a foreseeable danger or risk." *Kedra*, 876 F.3d at 437; *see also L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 246-47 (3d Cir. 2016).

Defendants argue that V.T.'s Amended Complaint contains no allegations that: (1) the cafeteria was particularly dangerous; (2) the District was aware V.T. was in the cafeteria during seventh grade lunch; and, (3) that any specific threats had been made regarding the cafeteria and that, thus, V.T. has not plausibly alleged that its actions shock the conscience. To the contrary, as discussed earlier, the Amended Complaint contains multiple allegations that Defendants were aware of Student 1's threats. Many students and parents reported Student 1's stated intention to attack someone during seventh grade lunch, with at least one report occurring "five hours" prior

7

to the attack itself.  Furthermore, while the Amended Complaint does not explicitly allege that Defendants were aware that V.T., a seventh grader, was in the cafeteria during seventh graders' assigned lunch period, she is entitled on a motion-to-dismiss stage to reasonable inferences in her favor.  *Brown v. Card Serv. Ctr.*, 464 F.3d 450, 452 (3d Cir. 2006).  Here, that includes the reasonable inference that Defendants expect students to comply with their assigned schedules during the school day, and therefore that V.T. would be present in the cafeteria for her assigned lunch period.  Taken together, these allegations plausibly show that the Defendants were on notice of the threats leveled by Student 1, and that the risk centered on the cafeteria.

Pennbrook personnel, nevertheless, brought Student 1 to the exact place where she allegedly intended to act on her threats, at the exact time she planned to take action, and when at least one of her intended targets was scheduled to be present.  Because the Defendants were on notice of Student 1's threats, intended targets, and planned location, such a decision exceeds "mere negligence."  *See Hope*, 972 F.3d at 329-30.  Rather, V.T. has plausibly alleged that the Defendants knew of this risk, and guided Student 1 into the cafeteria regardless, s*ee Kedra*, 876 F.3d at 437; *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 910 (3d Cir. 1997), which plausibly demonstrates that the District acted with "willful disregard" of a "foreseeable danger or risk."  *Kedra*, 876 F.3d at 437.

### iii.    *Affirmative Act*

As to the fourth element of a state-created danger claim—an affirmative act—it can be broken into its constituent parts: "(1) a state actor exercised his or her authority; (2) the state actor took an affirmative act[; and,] (3) this act created a danger to the citizen or rendered the citizen more vulnerable to danger than if the state had not acted at all."  *Ye v. United States*, 484 F.3d 634, 639 (3d Cir. 2007).  Critically, "[i]t is the misuse of state authority, rather than a failure to use it, that can violate [the Constitution]."  *Bright*, 443 F.3d at 282 (emphasis added).  In other

words, omissions and other "failures to act cannot form the basis of a valid [Section] 1983 claim." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 433 n.11 (3d Cir. 2006). Attempts to "redefine clearly passive inaction as affirmative acts" or "restating . . . inaction as an affirmative failure to act does not alter the passive nature of the alleged conduct." *Morrow*, 719 F.3d at 178-79; *see also Sanford v. Stiles*, 456 F.3d 298, 312 (3d Cir. 2006) (holding that a "failure to *prevent*" a student's death did not violate the Due Process Clause).

Defendants' sole argument is that V.T. has alleged only failures to act and therefore cannot satisfy this element. *See Bright*, 443 F.3d at 282. Indeed, for many of V.T.'s allegations, they are correct. Failing to "develop[] or revis[e] an IEP . . . conven[e] an IEP meeting, . . . conduct[] a psycho-educational reevaluation or functional behavior assessment, [or] issu[e] a [notice of educational placement ("NOREP")]" are omissions, not affirmative actions, and therefore cannot satisfy this element. *See id.*; *Kaucher*, 455 F.3d at 433 n.11. The same is true for McGee-Heim's alleged failure to remove Student 1 from Pennbrook once the District became aware of her threats. *See id.* As stated earlier, Defendants are correct that failures to act do not constitute misuse of state authority and therefore cannot sustain a state-created danger claim. *Kaucher*, 455 F.3d at 433 n.11; *Morrow*, 719 F.3d at 178-79.

However, the Amended Complaint alleges that Defendants should have, but did not, remove or otherwise isolate Student 1 after becoming aware of her threats. Neither did they implement protective measures to insulate V.T. from threatened violence. And then Student 1 was escorted into the cafeteria during V.T.'s assigned lunch period, thereby creating "a substantial risk of serious physical harm[.]" Defendants provide no citations or cogent argument as to why, given these circumstances, bringing Student 1 into the cafeteria does not constitute an affirmative act. On this point, their argument from soup to nuts is that "[s]imply escorting

Student 1, a 7th grader, to the cafeteria during 7th grade lunch period to get her lunch does not rise

to the level of 'affirmative act' necessary to support a state-created danger claim."  This

statement is conclusory and does not satisfactorily illuminate Defendants' contention that

bringing Student 1 into the cafeteria was not an affirmative act.  Thus, the Court need not give it

any credence.  *See* E.D. Pa. R. Civ. P. 7.1(c).[5]

---

[5] It is the opinion of at least one jurist that, "[o]f course, the law is not the place for the artist. . . ."  Oliver Wendell Holmes, Jr., *Collected Legal Papers* 29 (1920).  Yet submitted to this Court by Defendants are a series of arguments assembled with a considerable degree of artistic license.  Where the classical litigant presents her case by explaining how precedential legal principles apply to the instant facts and thus warrant whatever adjudication is sought, *see generally* Christine Coughlin et al., 4 *A Lawyer Writes* (2024) (describing the standard approach to legal writing which Defendants' counsel may find illuminating), Defendants have opted for a more abstract form of argumentation that leaves such indispensable legal documentation to the judicial imagination.  And while many an aspiring artist might relish the comparison of her work to that abstract expressionist standard-bearer Jackson Pollock, who championed a gestural art technique where paint is flung, dripped or flicked onto the canvas surface, the process should not be the inspiration for a lawyer whose job is rather to engage in exhaustive legal thinking, meticulous research and carefully considered writing.

While this Court does not necessarily agree with one critic of Pollock's paint splattering that his work is "mere unorganized explosions of random energy, and therefore meaningless," Steven McElroy, *If It's So Easy, Why Don't You Try It*, N.Y. Times, Dec. 3, 2010, at 9, it does borrow the word "[m]eaningless" as an apt characterization of the gesticulated yet unsupported legal arguments Defendants raise here and throughout their Motion to Dismiss.  Rule 7.1 of the Local Rules of Civil Procedure of the Eastern District of Pennsylvania requires that "[e]very motion . . . shall be accompanied by a brief containing a concise statement of the legal contentions and authorities relied upon in support of the motion."  E.D. Pa. R. Civ. P. 7.1(c).  In other words, parties cannot expect favorable disposition of their motions simply by invoking conclusory legal arguments with nothing more; instead, litigants must substantiate their assertions with legal authorities and logic that may persuade the court.  *See id.*; *Zimmerman v. NLRB*, 749 F. App'x 148, 150 (3d Cir. 2019) ("[A] 'skeletal argument' does not preserve a claim."  (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991))).  This Court has repeatedly reminded litigants that briefs "not accompanied by citations to legal authority or adequate explanations of the bases for the party's arguments may be denied as being legally deficient."  *Zaftr Inc. v. Lawrence*, 2023 WL 349256, at *17 (E.D. Pa. Jan. 20, 2023) (collecting cases); *see also, e.g.*, *Griffin-El v. Beard*, 2009 WL 678700, at *3-4 (E.D. Pa. Mar. 16, 2009) (holding "Defendants' thinly-veiled factual assertions and boilerplate, unsupported legal conclusions could alone warrant denial of their Motion" under Local Rule 7.1(c)); *Moore v. Vangelo*, 2004 WL 292482, at *6 (E.D. Pa. Feb. 12, 2004) (denying Defendants' motion to dismiss that "failed to set forth a factual or legal basis in support of their contention" in violation of Local Rule 7.1(c)).

As one scholar has suggested, "[j]ust as one of the goals of art is to infuse the subject matter of an artwork with feeling and meaning, the goal of an attorney is to make the judge see the meaning of the facts presented, not just the facts themselves."  James Parry Eyster, *Lawyer as Artist*, 14 Legal Writing 87, 105 (2008).  The same goes for a party's legal contentions, and here—as discussed *infra*—Defendant has failed in pursuit of that goal.  Once again, the genius of Jackson Pollock is not easily reproduced: "Anyone can fling paint around . . . , but you don't necessarily come up with anything."  Steven McElroy, *supra*, at 9.  Instead of submitting carefully developed legal arguments for the Court to examine as factfinder, Defendant's counsel has flung paints, brushes and canvases at the Court in the hope that it will figure out how to create the legal equivalent of a Pollock masterpiece.  Counsel could perhaps be better served if it reframed the job of the Court as the critic and the lawyer's job as toiling in the artist's studio— the place where the magic should happen.

Even so, the facts alleged plausibly support that the District took affirmative action.  On April 17, Student 1 was removed from her classes and escorted around Pennbrook by a District administrator.  It is reasonable to infer that the District was in control of Student 1's movements within Pennbrook, and actively shepherded her into the cafeteria during seventh grade lunch— actions which constitute an affirmative act, not an omission or failure to act.  *See Bright*, 443 F.3d at 282.

### B.  McGee-Heim Has Not Shown She Is Entitled to Qualified Immunity

McGee-Heim next argues that she is entitled to qualified immunity, and therefore dismissal is warranted.  Specifically, she argues that V.T. has not shown it is a clearly established constitutional violation to: (1) admit a troubled student into a public middle school; and, (2) maintain that placement even after officials allegedly learned of Student 1's threats.

Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  It "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  A two-part framework is used to evaluate whether a defendant is protected by the qualified immunity doctrine: (1) whether the facts as alleged constitute a violation of a constitutional or statutory right, and (2) whether the right at issue was "clearly established" at the time of the alleged misconduct.  *See id.* at 231-32.  A government official bears both the burden of pleading the defense, *Thomas v. Indep. Twp.*, 463 F.3d 285, 293 (3d Cir. 2006), and the burden of persuasion, *see Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 176 (3d Cir.

11

2011) ("The burden of establishing qualified immunity falls to the official claiming it as a defense." (citing *Harlow*, 457 U.S. at 819)); *see also Reedy v. Evanson*, 615 F.3d 197, 223 (3d Cir. 2010) ("The burden of establishing entitlement to qualified immunity is on [the defendant]." (citing *Harlow*, 457 U.S. at 808)).  Defining the contours of the right in question "is critical to determining whether it was clearly established; [courts] must define the right at the appropriate level of specificity." *Clark v. Coupe*, 55 F.4th 167, 181 (3d Cir. 2022).  At the pleading stage, "qualified immunity will be upheld . . . only when [it] is established on the face of the complaint." *Stringer v. Cnty. of Bucks*, 141 F.4th 76, 86 (3d Cir. 2025).

As explained above, McGee-Heim has not shown that the Amended Complaint fails to plausibly state a violation of a constitutional right.  Rather, it adequately alleges a Fourteenth Amendment substantive due process violation, as set forth above.  *See id.* ("[T]he first prong of qualified immunity analysis . . . fits like a glove at the motion-to-dismiss stage because it overlaps with a district court's inquiry under Rule . . . 12(b)(6). . . .  In other words, a well pleaded [Section] 1983 complaint necessarily alleges a constitutional violation for purposes of qualified immunity."); *Kedra*, 876 F.3d at 435.

McGee-Heim's defense therefore hinges on whether she can show the right in question was "clearly established" at the time of the alleged violation.  *See Mack v. Yost*, 63 F.4th 211, 228 (3d Cir. 2023).  She argues that the Amended Complaint lacks "any facts or claims that [she] caused a violation of a 'clearly-established' constitutional right of Plaintiff and/or that she would have understood she was violating any right of Plaintiff."  She maintains that she is entitled to qualified immunity because V.T.'s Amended Complaint does not contain "any factual allegations that would negate [McGee-Heim's] qualified immunity defense." *Thomas*, 463 F.3d at 291.

12

To reiterate, "the 'burden of pleading a qualified immunity defense,' like any other affirmative defense, 'rests with the defendant.'" *Stringer*, 141 F.4th at 86 (quoting *Thomas*, 463 F.3d at 293). McGee-Heim's argument flips this clear burden by claiming she is entitled to immunity because V.T. has failed to show she is not. Third Circuit law clearly forecloses this argument, as "[a] plaintiff 'has no pleading burden to anticipate or overcome a qualified immunity defense [in their complaint].'" *Stringer*, 141 F.4th at 86 (quoting *Thomas*, 463 F.3d at 289).

"[Q]ualified immunity" is not a "talismanic phrase that relieves Defendants of their burden to show that their actions did not violate . . . clearly established constitutional [or statutory] rights." *Jennings v. Borst*, 2019 WL 4447593, at *4 (E.D. Pa. Sept. 16, 2019). By raising an affirmative defense, McGee-Heim is responsible for offering sufficient argument and citations such that the Court can both define the right at issue and decide whether she has met her burden. *See Harlow*, 457 U.S. at 808, 819; *Clark*, 55 F.4th at 181. She has not done so, offering only critiques of the Amended Complaint and its alleged failure to disprove her defense. Therefore, McGee-Heim has not plausibly shown she is entitled to qualified immunity.[6]

### C. *Monell* Claim Against The District

V.T.'s *Monell* claim against the District is based on several theories of liability, including an alleged failure to train personnel in threat assessment and violence reduction.

*Monell* is the vehicle for pursuing civil rights claims against municipal entities. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 477-78 (1986). *Monell* does not permit municipal

---

[6] If appropriate, McGee-Heim may raise this defense again at summary judgment, where she will still have the burden of establishing immunity. *See Mack*, 63 F.4th at 227 ("'[T]he party asserting the affirmative defense of qualified immunity' bears the burden of persuasion on both prongs at summary judgment." (quoting *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014))).

13

liability based on *respondeat superior* or simply employing the alleged tortfeasor. *Beck v. City of Pittsburgh*, 89 F.3d 966, 972 (3d Cir. 1996). Rather, municipalities are only responsible for their own constitutional torts, *i.e.* acts "that are, properly speaking, acts of the municipality—that is, acts which the municipality has officially sanctioned or ordered." *Pembaur*, 475 U.S. at 480. Generally, this means a municipality's policies (*i.e.* an official "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers") or customs (*i.e.* practices which, though "not authorized by written law . . . [are] so permanent and well settled as to [possess] the force of law."). *Monell*, 436 U.S. at 690-91. Policy and custom can encompass a city's failure to adequately train its officials. *City of Canton v. Harris*, 489 U.S. 378, 387 (1989).

V.T.'s failure-to-train theory meets the standard. To succeed on such a claim, a plaintiff must show: (1) a constitutional violation; (2) that the failure to train "amounts to deliberate indifference to the rights of the persons with whom [officials] will come into contact[;]" and, (3) that the "identified deficiency in [the] training program" was closely related to the ultimate injury, "or actually caused the constitutional violation." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (internal quotations and citations omitted). "[D]eliberate indifference" is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of [their] actions." *Id.* Ordinarily, a pattern of "similar constitutional violations by untrained employees is necessary to demonstrate deliberate indifference for purposes of failure to train," but sometimes the need for training is "so obvious" that a single incident will suffice. *Id.* at 223 (citing *Canton*, 489 U.S. at 390 n.10).

V.T.'s specific allegation is that the District knew its threat-assessment trainings were inadequate, yet still failed to rectify that shortcoming, leading to her injuries. As discussed

14

above, she has offered sufficient facts to support that she was exposed to a state-created danger, in violation of her substantive due process rights.  Therefore, she has satisfied the first element of her failure-to-train claim.  *See Berg v. Cnty. of Allegheny,* 219 F.3d 261, 276 (3d Cir. 2000) (holding that the same constitutional violation supported Berg's Section 1983 claim and his *Monell* claim).  Turning to the remaining elements, the District fails to provide any legal citations or argument as to why the facts alleged in the Amended Complaint are inadequate to support V.T.'s claim.  That alone warrants a conclusion that it has not met its burden.  *See Heatherly*, 985 F.3d at 270; E.D. Pa. R. Civ. P. 7.1(c); *see also Reynolds*, 128 F.3d at 178.

In any event, the Amended Complaint alleges that a 2022 external, independent safety audit concluded that the District's threat-assessment trainings were deficient in numerous ways, including how to conduct threat assessments; how to properly staff threat-assessment teams; and when a threat triggers escalation to other authorities.  The external assessment allegedly warned that, without correction, the District's "threat assessment policy would not function as intended to prevent acts of violence." According to the Amended Complaint, while the District implemented "some trainings and maintained a threat-assessment policy," these remedies were "obviously" inadequate and incomplete, allowing "critical gaps" in its safety infrastructure to persist.  Specifically, V.T. alleges District staff are still inadequately trained in documenting threats; composing threat-assessment teams; referring threats to other authorities; involving "mental-health and student-support professionals[;]" and, implementing victim safety plans.  As a result, according to V.T., the District was "predictably" caught flatfooted when Student 1 began making threats, leading to V.T.'s injuries.

Given these allegations, reading them in the light most favorable to V.T., her *Monell* claim survives and the District's Motion to dismiss such claim shall be denied.

15

An appropriate order follows.

**BY THE COURT:**


**S/ WENDY BEETLESTONE**

**WENDY BEETLESTONE, C.J.**